**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE SNYDER-HILL, et al., | : | |
| | : | |
| Plaintiff, | : | Case No. 2:23-cv-02993 |
| | : | |
| v. | : | Judge Michael H. Watson |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendant. | : | |
| | : | |
| WILLIAM KNIGHT, et al., | : | |
| | : | |
| Plaintiff, | : | Case No. 2:23-cv-02994 |
| | : | |
| v. | : | Judge Michael H. Watson |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendant. | : | |
| | : | |
| EDWARD GONZALES, et al., | : | |
| | : | |
| Plaintiff, | : | Case No. 2:23-cv-03051 |
| | : | |
| v. | : | Judge Michael H. Watson |
| | : | |
| THE OHIO STATE UNIVERSITY, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendant. | : | |

**DEFENDANT THE OHIO STATE UNIVERSITY'S**
**RESPONSE TO PLAINTIFFS' PERSON OF AUTHORITY BRIEF**

I.      **INTRODUCTION.**

Before a university can be held liable for sexual harassment under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, a plaintiff bears the burden to establish—among other elements—that an "appropriate person" at the university had actual knowledge of the alleged misconduct and was deliberately indifferent to it. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998). Because a school is only liable under Title IX for its own deliberate indifference, not all employees at a university qualify as an appropriate person. *Snyder-Hill v. Ohio State University*, 48 F.4th 686, 702, 705 (6th Cir. 2022). Instead, only those "'high enough up the chain-of-command' that [their] decision constitutes the school's decision" qualify. *Kesterson v. Kent State Univ.*, 967 F.3d 519, 529 (6th Cir. 2020) (quoting *Hill v. Cundiff*, 797 F.3d 948, 971 (5th Cir. 2015)).

Plaintiffs' Briefing on Appropriate Persons (ECF No. 196 in *Snyder-Hill*, Case No. 23-CV-02993) ignores this fundamental rule and improperly seeks to apply negligence, respondeat superior and vicarious liability theories to their Title IX claims. *See Davis v. Monroe Cty Bd. of Educ.*, 526 U.S. 629, 642 (1999). To that end, plaintiffs assert that ***23 people*** at Ohio State qualify as an appropriate person under Title IX (regardless of their lack of knowledge or place in the university hierarchy). That is not the law.

As explained below, Ohio State's policies set out a far narrower set of individuals who qualify as an appropriate person responsible for taking corrective action on Ohio State's behalf. From 1978-1993, the Office of Affirmative Action was responsible for addressing and resolving complaints of sexual harassment at Ohio State. From 1993 through the end of the relevant time at issue, the Office of Student Affairs, aided by investigators in Human Resources, dealt with student complaints regarding sexual harassment by an employee. These offices, and their administrators,

were exclusively empowered to take corrective action on behalf of the university and were the appropriate people under Ohio State's policies and Sixth Circuit law. *See Kesterson*, 967 F.3d 519. It is only *if*, and when, these offices and their administrators had actual knowledge of sexual harassment that Ohio State could be held liable for purposes of Title IX if it was deliberately indifferent. *See Kesterson* at 527-528.

Here, there is no evidence that any complaints of sexual harassment regarding Dr. Strauss ever made their way to an appropriate person at Ohio State prior to 1996. When they did, Ohio State did not act with deliberate indifference.

## II.    FACTS.

Ohio State is a vast and complex institution. *See Snyder-Hill*, 48 F.4th at 705. At one point, during the relevant timeframe, Ohio State employed approximately 30,000 faculty and staff. Ex. A, Gee Depo. at 40:24-41:4.[1] To govern an institution as vast and complex as this, Ohio State's Board of Trustees adopted policies and procedures on many topics. Ex. B, Glaros Depo. Vol. I at 112:4-12; Ex. A, Gee Depo. at 38:18-25; *see also* Ohio Rev. Code 3335.08. This included policies and procedures defining sexual harassment, and the process for reporting, investigating, and addressing complaints of sexual misconduct. Ex. A, Gee Depo. 81:24-82:7, 82:25-83:2; Ex. B, Glaros Depo. Vol. I at 125:1-13; Ex. C, Glaros Depo. Vol. II at 611:8-612:18; *see also* Ex. A to Glaros Depo. Vol. II ("1980 Sexual Harassment Policy"); Ex. B. to Glaros Depo. Vol. II ("1983 Sexual Harassment Policy"); and Ex. C to Glaros Depo. Vol. II ("1993 Sexual Harassment Policy").

---

[1] The following transcripts are already on file: Chris Glaros Vol. I; John Lombardo; Archie Griffin; Andy Geiger; Rick Bay; Helen Ninos; Larry Romanoff; Gordon Gee; Paul Krebs; and John Doe 4 in *Knight*. Ohio State will separately file full unredacted copies of the following transcripts, not already on file: Chris Glaros Vol. II; Judy Brady; Markus Funk; Alex Shumate; Virginia Trethewey; and Louise Douce. Where referenced here, redacted excerpts are attached as exhibits to this brief.

As relevant here, Ohio State's sexual harassment policies applied to all parts of the university, including athletics and the student health center, and it was a violation of Ohio State's policies for a university employee to sexually abuse a student. Ex. A, Gee Depo. at 73:2-8; Ex. D, Shumate Depo. 80:3-7; Ex. B, Glaros Depo. Vol. I at 52:1-6. Ohio State required all faculty and staff—regardless of rank—to comply with these policies and to report sexual harassment to the offices designated to deal with sexual harassment. Ex. B, Glaros Depo. Vol. I at 231:24-232:19; Ex. C, Glaros Depo. Vol. II at 452:15-19. Corrective action, in turn, was also governed by the school's sexual harassment policies. Ex. A, Gee Depo. 81:24-82:7, 82:25-83:2; Ex. C, Glaros Depo. Vol. II at 428:19-431:7; 613:10-21. Whether someone was required to report sexual harassment was distinct from whether that person had the authority under Ohio State's policies to make decisions about sexual harassment complaints on Ohio State's behalf. Ex. C, Glaros Depo. Vol. II at 613:1-8.

From 1978 through 1993, reports of sexual misconduct were to be reported to and handled by the Office of Affirmative Action.[2] Ex. C, Glaros Depo. Vol. II at 416:3-7, 428:2-10; Ex. E, Bay Depo. at 217:6-19; *See* Ex. A to Glaros Depo. Vol. II 1980 Sexual Harassment Policy; Ex. B to Glaros Depo. Vol. II 1983 Sexual Harassment Policy. In relevant part, the policies for that period provided:

**C.     Responsibilities**

1.      The Office of Affirmative Action shall be responsible for the coordination, dissemination and implementation of this policy and guidelines. This office shall work closely with senior academic and non-academic administrators to assure compliance with the provisions of this policy. The Office of Affirmative Action shall serve as a resource with regard to sexual harassment-related matters.

---

[2] Prior to the 1980 sexual harassment policy, Ohio State directed students with complaints regarding sex discrimination, including sexual harassment, to the Office of Affirmative Action. *See* Ex. 277 to Glaros Depo. Vol. I, The Ohio State University 1978-79 Code of Student Rights and Responsibilities at 12-13 ("Appendix V - Student Grievances") (OSU_00002614-15); *see also* Ex. B, Glaros Depo. Vol. I at 44:10-16; 172:6-173:22.

3

2.      Each dean, director, department chairman and/or administrative officer of an operational unit shall cooperate with the Office of Affirmative Action in the implementation and dissemination of this policy and in providing an environment free of sexual harassment. ***Such officials shall refer complaints arising under this policy to the Office of Affirmative Action.***

* * *

**D.      Grievances**

1.      ***Individuals who believe that they have been sexually harassed should contact the Office of Affirmative Action***. The first efforts in response to a grievance shall be made on an informal basis through the Office of Affirmative Action.

Ex. B to Glaros Depo. Vol. II, 1983 Sexual Harassment Policy at 1-2 (emphasis added).

Beginning in 1993, complaints involving students and faculty were handled by the Office of Student Affairs in conjunction with the Office of Human Resources. Ex. C, Glaros Depo. Vol. II at 428:11-18, 613:10-21; *see also* Ex. C. to Glaros Depo. Vol. II 1993 Sexual Harassment Policy. Specifically, the Sexual Harassment Policy in effect from 1993 to 1997 provided as follows:

**Policy**

* * *

**III.      Responsibilities**

A.  The Office of Human Resources is responsible for the administration of this policy and the associated procedures.

* * *

**Procedure**

* * *

**IV.      Persons Authorized to Receive Complaints**

* * *

***Student Affairs, in accordance with the Code of Student Conduct, will be responsible for the investigation and resolution of sexual harassment complaints***

4

> *involving students in their academic roles. Employee Relations will participate in the investigatory process with Student Affairs when a student alleges sexual harassment by faculty or staff.*

Ex. C. to Glaros Depo. Vol. II 1993 Sexual Harassment Policy (emphasis added).

Thus, while numerous Ohio State employees supervised others and had reporting responsibilities, only a narrow group was empowered under the university's policies to handle sexual harassment complaints on the university's behalf. *See* Ex. B, Glaros Depo. Vol. I at 51:2-13; Ex. C, Glaros Depo. Vol. II at 428:19-431:7. When Ohio State ultimately received a complaint to Student Affairs and HR in 1996, it immediately placed Dr. Strauss on administrative leave and ended his ability to see patients at Ohio State. *See* Ex. F, Ninos Depo. at 72:18-73:8, 291:13-24; Ex. B, Glaros Depo. Vol. I at 309:22-310:12, 355:25-356:10; Ex. G, OSU's Answer to Inter. 30, 01/19/1996 Ltr from Mary Daniels (OSU_00000451) and 08/05/1996 Williams Ltr to Strauss (OSU_00000339).

## III.   LAW & ANALYSIS.

### A.   *Kesterson* Governs The Analysis.

Plaintiffs' brief cites an array of cases from around the country seeking to push the appropriate person at Ohio State down to the lowest possible level – *i.e.*, anyone in a managerial role and/or with a responsibility to report sexual harassment. *See* Plfs' Br. (citing *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1255 (11th Cir. 2010); *Wadsworth v. Nguyen,* 129 F.4th 38, 70 (1st Cir. 2025); *Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450, 457 (8th Cir. 2009); *Demarcus v. Univ. of S. Ala.*, 133 F.4th 1305, 1313 (11th Cir. 2025); *J.S., III v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 990 (11th Cir. 2017) *Colbert v. Univ. of S. Ala.*, No. 22-cv-184, 2024 WL 796548, at *6 (S.D. Ala. Feb. 6, 2024); *Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937, 958 (E.D. Mich. 2020);.*Frederick v. Simpson College*, 149 F. Supp. 2d 826, 837 (S.D. Iowa 2001)). That is not the law. Plaintiffs'

brief and its reliance on mostly out-of-circuit law ignores what the Sixth Circuit and United States Supreme Court have said about who is an appropriate person when it comes to Title IX. Specifically, while plaintiffs cite *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998) and *Kesterson v. Kent State Univ.*, 967 F.3d 519 (6th Cir. 2020) in passing, they ignore the reasoning of *Gebser* and the import of *Kesterson*'s holding and underlying facts.

In *Gebser*, the United States Supreme Court considered when a school may be held liable for damages in an implied right of action under Title IX for the sexual harassment of a student by a teacher. 524 U.S. at 277. In *Gebser*, the Court held that a damages remedy will not lie under Title IX "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the school's behalf has actual knowledge of [the misconduct]" and the ***school's response*** amounts to "deliberate indifference." *Id.* at 290. Thus, a damages remedy is not available "for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice." *Id.* at 284.

As the Court subsequently explained in *Davis v. Monroe Cty Bd. of Educ.*, 526 U.S. 629 (1999), *Gebser* "rejected the use of agency principles to impute liability to the district for the misconduct of its teachers" and "declined the invitation to impose liability under what amounted to a negligence standard." *Id.* at 642. Instead, a school will only be liable for damages "where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge." *Id.* As emphasized in *Davis*, this is a "high standard," and it eliminates any risk that a school will be liable in damages "not for its own official decision but instead for its employees' independent actions." *Id.* at 643.

In *Kesterson*, the Sixth Circuit clarified what is required to satisfy the high bar that *Gebser* imposes. In that case, a student-athlete at Kent State University alleged that she was raped. 967

6

F.3d at 523. The student-plaintiff kept quiet about the incident for more than a year, before telling her coach. *Id.* at 523-24. The student-plaintiff then told several more Kent State employees, including (a) two assistant coaches, (b) an academic counselor, and (c) the executive director of Kent State's Women's Center. *Id.* at 524. All these employees were mandatory reporters, but none notified Kent State's Title IX office. *Id.* Eventually, the student-plaintiff contacted the Title IX office and met with the school's deputy Title IX coordinator, at which time she filed a formal complaint. *Id.* At this point, Kent State started an investigation and (1) confirmed that the alleged rapist was no longer at the university and (2) gave the coach, who failed to report the incident in violation of university policy, the option to resign or face termination. *Id.* The Kent State policy at issue designated all employees as mandatory reporters but required that "all reports must ultimately be provided to the Title IX coordinator or deputy coordinators…." *see id.* at 531 (Stranch, J., concurring in part and dissenting in part).

In *Kesterson*, the Sixth Circuit affirmed summary judgment for Kent State on the plaintiff's Title IX claim, holding that Kent State's deputy Title IX coordinator was the appropriate person (and not the other employees the plaintiff notified). *Id.* at 527. In reaching this holding, the *Kesterson* Court, notably, rejected the very same arguments that plaintiffs are making here, including that lower-level employees with a duty to report were appropriate people and that a school should be liable under Title IX if its employees fail to follow school policy. *Id.* at 528-29. Specifically, the Court explained that "errors in judgment or violations of school policy" are insufficient, *id.* at 529, and "a university employee's ability to mitigate hardship or refer complaints does not make them an 'appropriate person.' Otherwise, every employee would qualify and schools would face a form of vicarious liability that Title IX does not allow." *Id.* at 528 (internal citations omitted). Instead, an appropriate person is someone with the authority to take corrective action on

7

the school's behalf and who is "high enough up the chain-of-command" that her decision constitutes the school's decision. *Id.* at 528-529.

As applied, *Kesterson* confirms that school policy dictates who is an appropriate person and that not every supervisor or employee with reporting obligations is an appropriate person. *See, e.g.*, *Dahmer v. W. Ky. Univ.*, No. 21-5318, 2022 WL 19296342, at *3 (6th Cir. Oct. 13, 2022) (looking to Western Kentucky University's policies to determine who was an appropriate person under Title IX with authority to address and remedy the alleged misconduct); *Gaiter v. Cleveland Heights-University Heights Bd. of Educ.*, No. 1:25-cv-1728, 2026 WL 972372, at *3-4 (N.D. Ohio April 10, 2026) (distinguishing between a "supervisor" and "a person within the school district who had the authority to make decisions on its behalf"); *Johnson v. Knox County Schools*, No. 3:22-cv-00136-TRM-DCP, 2022 WL 18283265, at *9 (E.D. Tenn. Nov. 10 2022) ("*Kesterson* seems to have restricted who may be deemed an 'appropriate person' to the extent a school employee does not constitute an appropriate person simply because they are a mandatory reporter.").

Here, *Kesterson* controls the appropriate person determination. Where Ohio State had dedicated offices and personnel responsible for dealing with complaints of sexual harassment (*e.g.*, the Office of Affirmative Action and/or Student Affairs and Human Resources), it cannot be deemed to have had actual knowledge until those offices (*i.e.*, its designated appropriate persons) knew and had the opportunity to address it on Ohio State's behalf. *Kesterson* at 527-529.

B.      <u>**Sexual Harassment Complaints In Athletics**</u>.

Plaintiffs' brief suggests that the following people within athletics all qualify as an appropriate person: Athletic Directors (Hugh Hindman, Richard Bay, James Jones, and Andy Geiger); Directors of Sports Medicine/Head Team Physicians (Robert Murphy and John

8

Lombardo); Senior Associate Athletic Directors (James Jones and Paul Krebs); Associate Athletic Director (Archie Griffin); and Assistant Athletic Director (Larry Romanoff). *See* Plfs' Br. at 1, 6-17 (ECF No. 196). ***They were not***. Instead, as stated above, the appropriate persons to deal with such a complaint were in (1) the Office of Affirmative Action (1978-1993) and/or (2) Student Affairs and Human Resources (1993 forward).

Ohio State's Athletic Directors did not deal with complaints of sexual harassment outside of the process set forth in the university's sexual harassment policies. *See* Ex. H, Geiger Depo. at 163:17-164:5 (testifying that he did not recall having to deal with sexual harassment and stating that if there was an allegation of sexual harassment within the Athletics Department he would have "follow[ed] the policy"). In fact, Andy Geiger (one of the athletic directors plaintiffs identified) testified that he lacked the authority to unilaterally remove Strauss because of sexual misconduct and would have needed to consult with his boss, David Williams (the Vice President for Student Affairs) and Human Resources:

> Q:     Could you as athletic director have unilaterally removed Strauss as a team doctor?
>
> A:     No.
>
> Q:     Why not?
>
> A:     Because he was employed as a -- with the student health and athletics within student affairs. I would have needed to consult with David Williams, who was vice president and my boss and the boss of the people at student health.· There are also procedures and policies that you have to go through in a separation to make sure you do it correctly, so legal affairs and HR would have been involved.
>
> Q:     Okay. But you would have had to consult with David Williams?
>
> A:     Yes.

*See* Ex. H, Geiger Depo. at  292:16-293:5. Similarly, Rick Bay (another athletic director identified by plaintiffs) testified that if he learned that a doctor was sexually abusing student athletes, he

9

would have reported it to his superiors at the university (*i.e.*, administrators besides him and higher up the "chain of command"):

> Q: If a coach of a female teenage student-athlete came to you and told you the student-athlete went to a team doctor for an orthopedic injury and the doctor had her take all of her clothes off and otherwise expose her genitalia, would you be concerned?
>
> A: Absolutely.
>
> Q: If she reported the doc then fondled her genitalia, would you be concerned?
>
> A: Yes.
>
> Q: What would you do?
>
> A: I would report it to probably Spillman or up to Jennings and begin the process of removing that person, if not reporting them to the authorities.

Ex. E, Bay Depo. at 307:2-16.

Other Senior Associate, Associate, and Assistant Athletic Directors (Paul Krebs, Archie Griffin, and Larry Romanoff) all likewise testified that they were not Strauss' supervisor or responsible for investigating and addressing complaints of sexual harassment, and that David Williams and Human Resources were. *See* Ex. I, Romanoff Depo. at 240:13-241:1, 185:8-186:7; Ex. J, Griffin Depo. at 224:6-225:20; Ex. K, Krebs Depo. at 31:3-22, 39:13-22, 194:23-196:15; 272:9-14; *see also* Ex. H, Geiger Depo. at 293:6-8.[3]

As for the head team physicians (Lombardo and Murphy), the fact that they were Strauss's supervisors is not enough alone to make either of them an appropriate person under Title IX. *See* Ex. B, Glaros Depo. Vol. I at 79:2-25; Ex. C, Glaros Depo. Vol. II at 437:20-438:7; *see also Gaiter*, 2026 WL 972372, at *3-4. Lombardo and Murphy could not act unilaterally and should have

---

[3] Krebs indicated his supervisor Andy Geiger would have been someone to tell and involve; however, as stated above, Geiger was not an appropriate person under Title IX and Ohio State's policies. *See* Part II.B, *supra*, at 8; *see also* Ex. C, Glaros Depo. Vol. II at 428:19-431:17.

followed the processes in place related to sexual harassment. Ex. H, Geiger Depo. at 293:9-11; Ex. I, Romanoff Depo. at 103:1-23; Ex. C, Glaros Depo. Vol. II at 436:19-24, 437:20-438:7, 440:3-11. Specifically, Lombardo's own testimony is directly contrary to what plaintiffs assert regarding who had the power to place Strauss on administrative leave and who actually did so:

Q.     And who put Dr. Strauss on administrative leave?

A.     Uh, the university.

Q.     Who?

A.     I don't know. I think it was David Williams.

Q.     Did you ever speak to Mr. Williams about Dr. Strauss?

A.     Uh, not that I recall.

Q.     Did you ever put Dr. Strauss on administrative leave?

A.     No.

Q.     Could you have?

A.     No.

Ex. L, Lombardo Depo. at 205:12-25. Similarly, if Dr. Murphy was aware that Dr. Strauss was engaging in sexual misconduct, Ohio State's policies required him to report that to the Office of Affirmative Action for it to correct:

Q.     If Dr. Murphy had been made aware that Strauss was fondling students genitals, their shaft, their testicles, everything in that area, OSU's policy required him to report that to the Office of Affirmative Action?

A.     Yes. If Dr. Murphy believed that anything he heard or saw or understood reflected sexual misconduct he should have reported those issues to that Office of Affirmative Action.

Ex. C, Glaros Depo. Vol. II at 440:3-11; *see also id.* at 441:5-442:16; Ex. B, Glaros Depo. Vol. I at 79:2-25. Indeed, Dr. Murphy's authority to do anything more is questionable, as he was "an

independent contractor," "not a doctor at the university." Ex. A, Gee Depo. at 164:14-18; *see also id.* at 215:16-216:5.

The deposition testimony that plaintiffs cite from Helen Ninos on this point is not contrary. *See* Ex. F, Ninos Depo. at 95:8-96:12 (describing how she told Lombardo that Strauss should be removed from seeing patients in athletics and how Lombardo was cooperative).

Beyond this, contemporaneous documents additionally show that personnel were trained on sexual harassment and advised that "corrective or disciplinary action" was to be taken in "consultation with" other offices, including Human Resources:

7. If sexual harassment occurred, consult with your dean, departmental personnel officer, Employee Relations and/or Dispute Resolution Services, and take appropriate disciplinary action. **Any corrective or disciplinary action should be taken in consultation with Academic Affairs and Human Resources.**

*See* Exhibit 74 to Geiger Depo., 09/16/1994 Ltr. re. Sexual Harassment Policy; Exhibit 75 to Geiger Depo., Sexual Harassment Workshop; Ex. H, Geiger Depo. at 164:24-14, 239:25-241:8; *see also* Ex. 277 to Glaros Depo. Vol. I, 05/09/1995 Ltr. re. Update on Sexual Harassment Policy (OSU_00005679-85) (describing trainings conducted for athletics and others); Ex. B, Glaros Depo. Vol. I at 256:21-258:9 259:4-260:16 (discussing efforts to train employees)

This was consistent with information that Ohio State provided to students, who were likewise advised to report complaints of sexual harassment involving an employee to the Office of Affirmative Action:

| Concern | Go To | Location | Prefix 42 Phone |
|---|---|---|---|
| Sexual Harassment By Employees | Office of Affirmative Action | 1100 Lincoln Tower, 1800 Cannon Dr. | 2-4207 |
| By Students | Office of Student Life | 464 Ohio Union, 1739 North High St. | 2-6091 |

*See* Ex. 346 to Glaros Depo. Vol. II, 1984-1985 Student Handbook at 101 ("Problem Solving and Information Guide") (OSU_00058364); *see also* Glaros Depo. Vol. II. at 409:17-410:10.[4]

Contemporaneous documents further establish that when complaints of sexual harassment were made in athletics, the Office of Affirmative Action investigated and resolved those complaints when such complaints were received. ███████

███████████████████████

███████████████████████

███████████████████████

███ ███ ████ ██ ████ █ ████ █ █ ████ ███

██████████████████

Thus, while the persons plaintiffs identified in athletics were all supervisors with certain responsibilities over personnel within the department, they were not appropriate people for the purpose of putting Ohio State on notice under Title IX. Instead, consistent with Ohio State policy, complaints regarding sexual harassment were reported to and dealt with by the Office of Affirmative Action (from 1978-1993) and the Offices of Student Affairs and Human Resources (from 1993 forward).

**C.** **Sexual Harassment Complaints In Student Health Services.**



---

[4] When the policy was updated in 1993, and the Offices of Student Affairs and Human Resources took over the handling of complaints of sexual harassment by university employees, Ohio State took steps to inform students of this change in the policy. *See* Ex. B, Glaros Depo. Vol. I at 263:16-264:13; *see also* Ex. 277 to Glaros Depo. Vol. I, 11/4/1994 Ltr. re. Code Revision: Sexual Harassment (OSU_030854–56).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████; *see also* Ex. O, Douce Depo. 125:24-126:3 (stating complaints regarding sexual harassment went to Human Resources). In other words, the directors of Student Health Services (like employees in athletics) were required to follow the university's sexual harassment policies. Ex. B, Glaros Depo. Vol. I at 99:20-101:23. Plaintiffs seek to have the Court believe these policies did not exist, but they cannot ignore them or what they mean for the individuals they claim were appropriate persons. *Id.*

Again, this process and the fact that the authority to take corrective action for purposes of Title IX rested outside of Student Health Services is confirmed by what transpired with respect to Dr. Strauss and contemporaneous records from Ohio State. Specifically, after a student complained about Dr. Strauss's conduct during a medical exam on January 5, 1996, and the complaint reached Student Affairs and HR, Strauss was placed on administrative leave from clinical duties "***with the approval of the Office of Human Resources***." *See* Ex. G, OSU's Answer to Inter. 30, 01/19/1996 Ltr from Mary Daniels (OSU_00000451) (emphasis added); *see also* Ex. F, Ninos Depo. at 72:18-73:8, 291:13-20 (discussing placing Strauss on administrative leave and barring him from seeing patients after January 8, 1996). Dr. Strauss was additionally informed at the time that "[the Office of Student affairs] in cooperation with the Office of Human Resources [would] be conducting an investigation."

14

Dear Dr. Strauss:

This letter is to inform you that the patient ███████████ has filed a complaint about your professional conduct during an office visit at Student Health Services on Friday, January 5, 1996. ███████████ has accused you of needlessly prolonging the examination and fondling him. He also has stated that some of your verbal communications with him were unnecessary and unprofessional.

I understand that Dr. Grace has informed you of these charges in person, and that with the approval of the Office of Human Resources you have been placed on administrative leave from clinical duties within the University pending the outcome of an investigation. My office in cooperation with the Office of Human Resources will be conducting an investigation, and will notify you when a hearing date has been set.

Sincerely,

Mary A. Daniels, Ph.D.
Assistant Vice President for Student Affairs

Ex. G, OSU's Answer to Inter. 30, 01/19/1996 Ltr from Mary Daniels (OSU_00000451).

Subsequently, Helen Ninos from *Human Resources* conducted an investigation with David Williams, *Vice President of Student Affairs*. *See* Ex. F, Ninos Depo. at 60:1-7, 273:25-274:22. And it was David Williams, Vice President of Student Affairs, who had the authority to take corrective action on Ohio State's behalf and did so in this case:

15

Dear Dr. Strauss:

In January 1996 you were placed on administrative leave as a result of a complaint filed by a patient who had been examined by you. In March you were notified that the Office of Student Affairs was considering nonrenewal of your 20% position with Student Health Services. This was based on a total of three complaints by students in a period of 13 months. On June 5 you and your counsel met with me and Helen Ninos, Associate General Counsel for Human Resources, for approximately two hours while you relayed to me your position on these complaints. At that time you also provided extensive written materials for my review.

I have considered all of the information you have provided and have received information from Judy Brady, Dr. Miller and Dr. Grace. Based upon the information received during this entire process, your appointment with Student Health Services will not be renewed. This action is effective immediately. As discussed previously, your faculty appointment in the School of Public Health will continue, and should you have any questions concerning that position you should contact Dr. Ronald St. Pierre. I regret having to make this decision but based on the information provided, believe that the nonrenewal of your appointment in the Student Health Services is in the best interest of all concerned.

Sincerely,

David Williams, II
Vice President for Student Affairs
and Professor of Law

See Ex. G, OSU's Answer to Inter. 30, 08/05/1996 Williams Ltr to Strauss (OSU-00000339); *see also* Ex. F, Ninos Depo. at 195:9-24, 203:8-21, 228:7-9.[5]

Thus, contrary to what plaintiffs assert, and what Dr. Grace may have remembered and testified to, Dr. Grace did not act unilaterally, and the Office of Student Affairs and Human Resources were responsible for purposes of Title IX for investigating Dr. Strauss and taking corrective action. *See* Plfs' Br. at 17-19 (ECF No. 196). Prior to that, the Office of Affirmative

---

[5] Records also show that it was Williams who notified athletics that Strauss was being investigated and started the process of his removal there as well. *See* Ex. H, Geiger Depo. at 196:12-197:9; Ex. 4 to Lombardo Depo., 01/10/1996 Krebs Email to Geiger (OSU_00000075) (stating "[Strauss] has been put on administrative leave effective immediately" and that "David Williams called to inform [them] a preliminary review [would] be held [that day]"). This occurred January 8, 1996, and Dr. Strauss did not see any patients in athletics or Student Health Services after that date. Ex. F, Ninos Depo. at 291:13-24.

16

Action was responsible until November 5, 1993. *See* Ex. A to Glaros Depo. 1980 Sexual Harassment Policy; Ex. B to Glaros Depo. 1983 Sexual Harassment Policy; Ex. C. to Glaros Depo., 1993 Sexual Harassment Policy.

### D.       The Authority of Others To Deal With Sexual Harassment.

Plaintiffs' brief also asserts that the following additional seven individuals at Ohio State qualify as an appropriate person: (1) Helen Ninos, (2) Virginia Trethewey, (3) Mary Daniels, (4) Manuel Tzagournis, (5) Russ Spillman, (6) David Williams, and (7) Linda Tom. *See* Plfs' Br. at 19-20. Some of these people qualify as an appropriate person for Title IX purposes. Others do not.

As stated above, Ohio State agrees that from November 5, 1993 onward David Williams, Vice President of Student Affairs, was an appropriate person to take corrective action on Ohio State's behalf under its policies. *See* Parts II and III.B-C, *supra*; *see also* Ex. C. to Glaros Depo., 1993 Sexual Harassment Policy. Ohio State also agrees that Linda Tom was an appropriate person but only for the purpose of dealing with any appeals by Strauss or others under the 1993 policy. *See* Ex. C. to Glaros Depo., 1993 Sexual Harassment Policy at Procedures, Part VIII.B.7 ("A finding may be appealed to the Vice President for Human Resources.").[6]

But beyond that, Linda Tom and Helen Ninos (employees in Human Resources) had only the power to assist David Williams and Student Affairs in their *investigation* of Strass. Ex. C. to Glaros Depo., 1993 Sexual Harassment Policy at Procedures, Part IV ("Student Affairs…will be responsible for the investigation and *resolution of sexual harassment complaints* involving students in their academic roles. Employee Relations will participate in the investigatory process with Student Affairs…"); *see also* Ex. F, Ninos Depo. at 199:20-22 (confirming she could not

---

[6] Plaintiffs additionally identify the university President and Board of Trustees as appropriate persons. Ohio State agrees that the President and Board are sufficiently "high enough up the chain-of-command" for the purposes of this analysis. *See Kesterson*, 967 F.3d at 529.

"overrule" David Williams). Mary Daniels, an assistant vice president of student affairs, likewise could and did assist David Williams, but was not herself an "appropriate person." *See* Part III.C, *supra*. The ultimate decision-maker at the time regarding the "resolution of sexual harassment complaints involving students" was David Williams. *See id.*[7] ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

Prior to 1993, the Office Affirmative Action, not the Office of Student Affairs, was the place that sexual harassment claims were dealt with. Accordingly, Russ Spillman, the VP of Student Affairs from 1984 – 1992, was not an appropriate person during his and Strauss's overlapping tenures for the purpose of dealing with sexual harassment complaints against Strauss. *See* Ex. B to Glaros Depo. 1983 Sexual Harassment Policy at 2 ("Such officials shall refer complaints arising under this policy to the Office of Affirmative Action.").

### E.     Perkins Coie And What Ohio State Knew.

Despite acknowledging that the actual knowledge element is beyond the scope of this briefing, Plaintiffs insist that "[f]or nearly two decades," Ohio State "knew that Dr. Richard Strauss was sexually abusing students who trusted him as a physician." Plfs' Br. at 1 (ECF No. 196). They point, however, only to statements from the Perkins Coie Report and testimony of Caryn Trombino, Perkins Coie's investigator, to purportedly establish such knowledge. *See id.* at 7, 10,

---

[7] The fact that Ninos, Tom, and others had to cooperate with other offices when corrective action was required distinguishes this case and these individuals from those in *Doe v. Bd. of Educ. of Columbus City Schools*, where the individuals involved "had the authority to discipline staff or initiate an investigation, ***without anyone else's permission***." No. 2:23-cv-1006, 2025 WL 888461, at *7 (S.D. Ohio March 20, 2025) (emphasis added).

12, 15, 18. ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████ Moreover, plaintiffs selectively omit the fact that Perkins

Coie concluded "there [was] *no evidence that any reports or complaints concerning Dr. Strauss'*

*sexual misconduct were elevated to the attention of University administrators outside the*

*Athletics Department and Student Health, prior to January 1996*." Perkins Coie Report at 144

(emphasis added) (ECF No. 196-39).

More fundamentally, plaintiffs allusions to knowledge omit the facts that (1) most of the

persons they identified as appropriate persons testified that no one reported any issues of sexual

misconduct by Strauss to them, and (2) plaintiffs themselves did not make a complaint about Dr.

Strauss's exam techniques or conduct to anyone they identify as an appropriate person (much less

the Offices of Affirmative Action and/or Student Affairs). *See* Group Exhibit R, Discovery Plaintiff

Fact Sheets at Question 30; Ex. H, Geiger Depo. at 291:12-292:8; Ex. K, Krebs Depo. at 308:7-

309:9; Ex. I, Romanoff Depo. at 219:22-223:17, 248:13-21; Ex. E, Bay Depo. at 331:25-332:5,

348:25-349:10; Ex. J, Griffin Depo. at 298:11-23; Ex. A, Gee Depo. at 319:14-321:3; Ex. L,

Lombardo Depo. at 235:6-9.[8]

Finally, when a complaint did reach an appropriate person under Ohio State's policies (*i.e.*,

administrators in Student Affairs in 1996), Ohio State placed Dr. Strauss on administrative leave

immediately, investigated his conduct, and terminated his clinical privileges in athletics and

student health. *See* Ex. F, Ninos Depo. at 72:22-73:8, 291:13-24; *see also supra* at Part III.C.

---

[8] William Knight claims to have talked to Geiger about the environment in Larkins Hall, but that claim is waived, as explained in Part III.F, *infra*. John Doe 4 in the *Knight* case, No. 2:23-cv-02994, allegedly reported to Hugh Hindman that Dr. Strauss was a homosexual at a meeting about the condition of his team's field (not that Dr. Strauss sexually harassed him). *See* Ex. S, JD 4 Depo. at 228:19-229:3, 230:23-231:16, 234:22-25.

Again, the issue of knowledge is beyond the scope of this briefing, but to the extent plaintiffs implicitly raise it, the record evidence firmly establishes that Ohio State did not have actual knowledge of Dr. Strauss's conduct and was not deliberately indifferent.

### F. Larkins Hall.

Plaintiffs' Brief focuses exclusively on who was an appropriate person at Ohio State with regard to Dr. Strauss's alleged conduct. *See* Plfs' Br., *passim*. Beyond one passing reference to Larkins Hall in connection with Dr. Strauss's provision of medical services as a team physician, *see id.* at 11, Plaintiffs' Brief is otherwise silent regarding Larkins Hall and its environment more generally (*e.g.*, the presence of alleged voyeurs and people other than Strauss engaging in harassing conduct). Accordingly, Plaintiffs have waived or forfeited any claims, including any purported class claims, regarding Larkins Hall that are separate from Strauss by failing to brief them here. *See U.S. v. Huntington Nat. Bank*, 574 F.3d 329, 332 (6th Cir. 2009) ("To preserve [an] argument…the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it.").

### IV. CONCLUSION.

For the reasons stated above, the Court should hold that the appropriate people at Ohio State in these cases were the President, the Board of Trustees, and the Office of Affirmative Action from 1978-1993 and the Office of Student Affairs from 1993 forward. These were the people "high enough up the chain of command" at Ohio State and the offices at Ohio State responsible for dealing with sexual harassment under Ohio State's policies. It is only if, and when, these offices and their administrators had actual knowledge about sexual harassment that Ohio State could be held liable for purposes of Title IX. This is the law of the Sixth Circuit. *See Kesterson*, 967 F.3d at 527-529.

Respectfully submitted,

DAVE YOST
ATTORNEY GENERAL OF OHIO

/s/ Michael H. Carpenter
Michael H. Carpenter (0015733)
(Trial Attorney)
Timothy R. Bricker (0061872)
Michael N. Beekhuizen (0065722)
Michael J. King (0072597)
David J. Barthel (0079307)
Tyler K. Ibom (0085928)
Joseph B. Kunkel (0087007)
Gregory R. Dick (0097816)
CARPENTER LIPPS LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, OH 43215
Phone: (614) 365-4100
Fax: (614) 365-9145
carpenter@carpenterlipps.com
bricker@carpenterlipps.com
beekhuizen@carpenterlipps.com
king@carpenterlipps.com
barthel@carpenterlipps.com
ibom@carpenterlipps.com
kunkel@carpenterlipps.com
dick@carpenterlipps.com

*Special Counsel for Defendant*
*The Ohio State University*

21

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed electronically on May 26, 2026.  Notice was sent by operation of the Court's electronic filing system to all other counsel who have entered an appearance and any parties who have entered an appearance through counsel.  The parties may access this filing through the Court's ECF system.

/s/ Michael H. Carpenter
Michael H. Carpenter

*Trial Attorney for Defendant*
*The Ohio State University*